IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs September 20, 2017

## JOSHUA PAUL LEWIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Cumberland County
No. 10-0008        David A. Patterson, Judge**

_____

### No. E2016-01993-CCA-R3-PC

_____

A Cumberland County jury convicted the Petitioner, Joshua Paul Lewis, of two counts of rape of a child and one count of attempted rape of a child, and the trial court sentenced him to serve an effective sentence of twenty-five years. This court affirmed the Petitioner's convictions and sentence. *State v. Joshua Paul Lewis*, No. E2014-00918-CCA-R3-CD, 2015 WL 795856 (Tenn. Crim. App., at Knoxville, Feb. 25, 2015), *no Tenn. R. App. P. 11 filed*. The Petitioner subsequently filed a petition for post-conviction relief, alleging that he received the ineffective assistance of counsel. The post-conviction court held a hearing on the petition and denied relief. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Jonathan R. Hamby, Crossville, Tennessee, for the appellant, Joshua Paul Lewis.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Amanda M. Worley, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History

#### A. Trial

This case arises from the Petitioner's multiple rapes of the victim, a nine-year-old boy, who was the child of the Petitioner's friend. For these offenses, a Cumberland

County grand jury indicted the Petitioner for two counts of rape of a child and one count of attempted rape of a child. When the Petitioner appealed his convictions and sentence, this court recited the following facts presented at the pretrial hearing and at trial:

> Investigator Jeff Slayton with the Cumberland County Sheriff's Department testified that he was one of the officers who interviewed the [Petitioner] on December 9, 2009. He identified an "Admonition and Waiver and Waiver of Rights" document bearing the same date and signed by the [Petitioner]. The document also indicates a time of 9:07 p.m. This document was subsequently admitted into evidence.

> Investigator Slayton stated that, earlier that day, he had been in a "lengthy . . . vehicle pursuit" of the [Petitioner]. During the [Petitioner]'s apprehension, he was pepper-sprayed at some time late in the afternoon, but before 6:00 p.m. Investigator Slayton stated that he had been pepper-sprayed as part of his training and that the effects last from thirty to forty-five minutes.

> Investigator Slayton interviewed the [Petitioner] together with Investigator Chad Norris. A "DCS" agent, whose name he could not remember, was also present. The interview took place in the training room of the justice center. The [Petitioner] was in custody at the time.

> Investigator Slayton read the Admonition and Waiver to the [Petitioner], and the [Petitioner] then read the Waiver of Rights out loud. According to Investigator Slayton, the [Petitioner] had no trouble reading the document. The [Petitioner] did not complain about being unable to read because of the pepper-spray. After the [Petitioner] had read the Waiver of Rights out loud, he signed it. Investigators Slayton and Norris both witnessed the [Petitioner]'s signature.

> Investigator Slayton proceeded to question the [Petitioner] about the pursuit. He also questioned him about the instant allegations, of which Investigator Slayton had just learned. At no time did he promise the [Petitioner] a lower bond if he confessed to the sex offense charges. After Investigator Slayton finished his oral interview of the [Petitioner], Investigator Norris reduced the [Petitioner]'s statement to writing.

> On cross-examination, Investigator Slayton maintained that the [Petitioner]'s eyes were not "irritated" during the interview and that the [Petitioner] had been able to look at and focus on Investigator Slayton. He

also maintained that the [Petitioner] was "calm" and "understanding" while the Admonition and Waiver was read to him. Investigator Slayton described this information as the [Petitioner]'s Miranda rights. The [Petitioner] did not have on handcuffs, but Investigator Slayton did not remember if the [Petitioner] had on leg-shackles. According to Investigator Slayton, there was no audio-recording of the interview.

Investigator Chad Norris with the Cumberland County Sheriff's Department testified that he witnessed the [Petitioner] sign the Waiver of Rights. He also stated that he reduced the [Petitioner]'s statement to writing. He identified the document and explained his process for creating it:

> The way I do my statements is, I will write a portion of it, after what they've told me what they want to say, I'll write their words and I'll read back what I've wr[itten]; and then I'll continue on with it, write a small—another portion of it, read it back, and all the time asking them, "Is this what you want me to say? Is this correct?" And I do that throughout the whole statement. Then I give them the statement and have them read over it.

Investigator Norris confirmed that he followed this process with the [Petitioner]'s written statement. He then read the statement into the record:

> I had several sexual contacts with [the victim] after he came on to me. I touched his penis several times, I'm not sure exactly how many times. He played with my penis several times as well. I never came/ejaculated while he played with my penis. When it first started we were both into it, but in the later part of the relationship [the victim] was more into it than me. I gave him a blow job more than one time, but I'm not sure exactly how many times. Most of the sexual acts occurred at Valerie D[]s' house on Old Highway 70. On one occasion while at the cemetery on POW Camp Rd not too far from Valerie's house [the victim] wanted to have sex in Valerie's van. He got in the back seat and took his pants off. He had his legs raised up and I had my pants unzipped with my penis out. I had a condom on and was about to put my penis in his butt, but decided [to] stop before we had intercourse. At a house on Old Mail Road where I

3

was doing work me and [the victim] laid on top of each other, but nothing happened there. I wish these things hadn't happened and I would take them back if I could.

Investigator Norris testified that the [Petitioner] signed this written statement at 10:45 p.m. He also testified that he did not promise the [Petitioner] a lower bond if he confessed to these crimes.

On cross-examination, Investigator Norris stated that it was "typical" for him to write a suspect's statement. Investigator Norris also affirmed that the [Petitioner] had been taken into custody on unrelated charges. He stated that he had previously interviewed the [Petitioner] on the instant charges on August 11, 2009, in the [Petitioner]'s driveway. He did not obtain a statement from the [Petitioner] on that day.

The [Petitioner] testified at the suppression hearing that he had run from the police on December 9, 2009, because he had been told they were going to beat him up. He also stated that he "remember[ed] getting beat up by most of the sheriff's department and maced a couple of times." His eyes were burning, and he tried to rinse them with water, but "that made it a hundred times worse." He did not remember at what time he was sprayed because he "was on Xanax," but he stated that it was "dark out." He described the sensation of being sprayed as "someone was jabbing a knife in [his] eye."

When asked about the interview, the [Petitioner] stated that all he could remember talking about was "running from the cops." He did not remember Investigator Norris presenting him with the written statement. He acknowledged having signed some "papers" but stated that he was not sure what they were and that he did not read them. He testified that the officers told him "that if [he] signed the paper that they would make sure [he] got the lowest bond possible to get out." He stated that he had not been capable of reading during the interview because his eyes were still burning. He also stated that he did not remember his Miranda rights being read to him.

On cross-examination, the [Petitioner] stated that he was twenty-eight years old and could read and write. When shown his statement, he acknowledged that the signature "look[ed] pretty close to" his own. He also averred that he had bad eyesight, including "astigmatisms."

4

The defense argued that the [Petitioner]'s statement was not voluntary. The trial court disagreed, ruling from the bench that "the proof is overwhelming in favor of [it] being a voluntary statement." Accordingly, the trial court denied the [Petitioner]'s motion to suppress. At the subsequent jury trial, held in March 2011, the following proof was adduced.

Valerie D., the victim's mother, testified that she had three children: an elder son, who was twelve years old at the time of trial; the victim, ten years old at the time of trial; and a daughter, seven years old at the time of trial. In 2009, she and the children lived in Cumberland County on Old Highway 70. She was using methamphetamine at the time, but she had been "clean" for a year and a half preceding the trial.

The victim's mother identified the [Petitioner] and explained that she had met him in 2003 through Athena Donaldson, a mutual friend. She described the [Petitioner] as having been "very good with children." Her sons were "very young at the time," and the [Petitioner] "was very polite, very nice around them, and he would like to take them places." She and the [Petitioner] both moved away, however, and she did not see him again until 2009, when he began staying with Donaldson.

After the [Petitioner] learned of the victim's mother's whereabouts in 2009, he began visiting her again. She described him as her friend at the time and a friend of the children. She testified that she trusted him, adding,

> He was really good with kids, and I trusted him enough to send them away with him, because he had his own business, and he mowed lawns, and I thought it would . . . be a good thing for the boys to get out of the situation at home and go have like a little part-time job, something they could . . . grow on, and have a little bit of money, and, you know, learn the value of a dollar. And so they would go with [the [Petitioner]] to go and mow lawns and other things.

The victim had turned nine years old in April of that year. The victim's mother testified that her two sons were with the [Petitioner] most of the summer of 2009. However, toward the latter part of the summer, the [Petitioner] began spending more time with the victim, leaving the elder son behind.

The victim's mother became concerned about the discrepancy in the

5

time the [Petitioner] was spending with her sons. She took the victim to a park on a day near the end of July to speak with him privately. Based on this conversation, during which the victim was "[s]cared" and "crying," she became very concerned. They went to the police station the next day. After this conversation, she decided not to allow the victim to be around the [Petitioner].

On cross-examination, the victim's mother acknowledged that she and the [Petitioner] used methamphetamine together while the children were asleep. She stated that the [Petitioner] took the victim without his brother "several times" during the summer of 2009. She denied having ever witnessed the [Petitioner] touch the victim inappropriately.

Investigator Slayton testified at trial that he interviewed the [Petitioner] on December 9, 2009. Investigator Chad Norris was also present. Investigator Slayton identified the [Petitioner]'s written waiver of his rights and his written statement, and both were introduced into evidence without objection. He stated that, prior to the [Petitioner]'s signing the waiver, he read the [Petitioner] his Miranda rights. He even had the [Petitioner] read out loud the waiver of those rights. He witnessed the [Petitioner] then sign the Waiver of Rights. The [Petitioner] then agreed to speak with Investigator Slayton.

Investigator Slayton testified that he then interviewed the [Petitioner] about the instant charges. After the verbal interview, a written statement was prepared, which the [Petitioner] then adopted and signed. Investigator Slayton read the written statement set forth above to the jury. Investigator Slayton testified that, at the time he gave his statement, the [Petitioner] "was very coherent and very understanding of everything that was going on in the room at that time." According to Investigator Slayton, the [Petitioner] "began to tear up" during his statement and "seemed very remorseful for what he was telling [him] had happened."

On cross-examination, Investigator Slayton acknowledged that the interview lasted an hour and forty-five minutes and began shortly after nine o'clock in the evening. He denied having pressured the [Petitioner] "in any way." He also stated that there was no audio or video recording of the interview. He acknowledged that the written statement was in Investigator Norris's handwriting.

The victim testified that he was currently ten years old. During the

6

summer of 2009, when he was nine years old, he lived in a house on Old Highway 70 in Cumberland County with his mother and siblings. The [Petitioner], whom the victim identified in court, came by and visited, and he spent some time alone with the [Petitioner] that summer.

The victim testified that, during the summer, he went with the [Petitioner] to the state park in Crossville in the [Petitioner]'s car, a Firebird or a Thunderbird. The victim played at the park for a while and then went to use the bathroom. The [Petitioner] followed him into the restroom. There was no one else present. The victim went into a stall, and the [Petitioner] went into the stall with him. The victim found this "very odd" and, consequently, was "scared." The victim stated that the [Petitioner] put the victim's penis in his mouth.

The victim next identified a photograph of a couch in the victim's house. On a day during the summer of 2009, he was on the couch with the [Petitioner]. The victim was wearing pants. The [Petitioner] put the victim's penis in his mouth.

The victim next identified a photograph of Oaklawn Cemetery that the victim stated was in Cumberland County. The cemetery was close to the victim's house. During the summer of 2009, the victim went there with the [Petitioner] in the victim's mother's van. They drove to a spot where the road was not visible and parked. The victim was in the front seat, but the [Petitioner] told him to get in the back of the van. The victim did so and saw the [Petitioner] put a condom on the [Petitioner]'s penis. The [Petitioner] then pulled down the victim's pants and "tried to stick it up . . . [the victim's] butt." The victim testified that he was "scared." The episode lasted "a couple of minutes." The victim did not feel the [Petitioner]'s penis inside him, but he stated it was "close." The [Petitioner] stopped, saying he thought he saw a light in a house nearby. They then left the cemetery.

Later, the victim told his brother what had happened. His brother told their mother, and the victim then talked to his mother about it at a park. They went to the police station, and he "told this lady what happened." The victim testified that the [Petitioner] had told him not to tell anyone or they "would crash into a brick wall." They were in the [Petitioner]'s car when the [Petitioner] said this to the victim.

Investigator Norris testified that he first learned about the allegations

involving the victim in late July 2009. On that day, the victim's mother and the victim came in and made a report. A Department of Human Services worker was assigned and interviewed the victim at the House of Hope. Investigator Norris watched this interview on television while it was being conducted and recorded. There was also a forensic medical exam conducted of the victim, but the results were inconclusive.

After the victim was interviewed, Investigator Norris began looking for the [Petitioner]. They spoke over the phone and scheduled an interview. On August 11, 2009, Investigator Norris, accompanied by Investigator John Haynes, met the [Petitioner] at the [Petitioner]'s residence. They spoke outdoors. The [Petitioner] was advised of his Miranda rights and agreed to speak with them. When they informed the [Petitioner] that they were there because of the victim, the [Petitioner] "became emotional" and "requested to stop talking." Investigator Norris told the [Petitioner], "[W]e'll get back in touch," and the two officers left.

Investigator Norris testified that "two days or so after that," he attempted to contact the [Petitioner] but was unsuccessful. Numerous subsequent attempts were also unsuccessful. In December, he learned that the [Petitioner] was at the Justice Center. The [Petitioner]'s interview and statement ensued. Investigator Norris identified places on the written statement that contained corrections requested by the [Petitioner] and bearing the [Petitioner]'s initials. Investigator Norris also signed the statement as a witness. The statement is dated December 9, 2009, at 10:45 p.m. Investigator Norris explained that the time indicated the end of the interview and statement. Investigator Norris confirmed that he had written out the statement. He also opined that the [Petitioner] understood what was being recorded in the statement as Investigator Norris was composing it. The [Petitioner] did not appear to be under the influence of any drugs or narcotics. The [Petitioner] had told him, however, that he had been "maced" earlier. Investigator Norris stated that he had been sprayed with mace and knew it to be "not pleasant at all." He added that, "by 30 minutes, the main effects were gone from it."

The [Petitioner] testified at trial that he was currently twenty-nine years old. He worked as a landscaper. He had a prior conviction for driving on a revoked license. He described his relationship with the victim as "trying to be a friend of the family." He took the victim to mow yards, go fishing, play laser tag, and they went to "Chuckles." At the beginning of his friendship with the victim's mother, when he was living with

8

Donaldson, the victim's mother would bring her children over "and drop them off for days at a time."

The [Petitioner] acknowledged having signed the statement written by Investigator Norris. He testified that he "actually didn't know what [he] was signing, but [he] was told [he'd] be able to bond out and get out of there. [He] was under a lot of stress, and [he] had been roughed up and maced prior to coming in." About his initial August conversation with Investigators Norris and Hayes, he testified as follows:

> [W]e stood there and talked for quite some bit, and they just started getting into saying—talking about personal things, about, if I remembered how it was when I was nine years old when I woke up on my belly and had a hard-on. It was just questions like that, and I was starting to get upset about them. I didn't really feel comfortable with them talking to me about stuff like that. And then they brought up [the victim], and I told them that I had no knowledge of anything– any of the accusations made towards me. I then told them that I didn't want to speak with them anymore, that I'd like to get in touch with an attorney. And my niece c[a]me running out to me, and that's when I ended the whole conversation and walked away.

As to the interview at the Justice Center in December, the [Petitioner] stated that he had been handcuffed and shackled. He stated that, initially, there were three other people in the room, but the female was asked to leave after he kept denying the accusations. About midway through the interview, Investigator Norris left, and Investigator Slayton "got a little bit more fierce." He stated that he did not remember signing the Waiver of Rights document.

The [Petitioner] denied ever touching the victim inappropriately. He disagreed with the assertions in the written statement. He testified that the victim "asked [him] one time if he could call [him] dad and stuff, and it turned into kind of a father-son relationship after that."

On cross-examination, the [Petitioner] stated that, before he was "maced" on December 9, 2009, he had been fleeing from the police "in fear for [his] life." He explained that the victim's mother had told him that "something bad was going to happen to [him]," that her ex-boyfriend was

9

friends with an officer, and that "he was going to make sure that [the [Petitioner] didn't make it to court." He stated that Investigators Norris and Slayton had lied and that the victim had lied. He averred that he signed the written statement because he "wanted a bond, [he] wanted to get out of jail." He testified that the investigators told him, "Once you sign this paper, you can go." He said that he was not fully aware of what was in the written statement. He explained that he had a lot of medical problems with his eyes, that he had been "maced," and that he was "on" Xanax and methamphetamine at the time. He did not remember telling the investigators that he had not used drugs for three months and that he had not been drinking alcohol.

*Lewis*, 2015 WL 795856, at *1-7. The jury convicted the Petitioner on all three counts as charged. The trial court subsequently sentenced the Petitioner to twenty-five years on each of the two rape of a child convictions and to ten years on the attempted rape of a child conviction. The trial court ordered that the sentences run concurrently and be served in the Department of Correction. *Id.* at *8.

### B. Post-Conviction

The Petitioner filed a petition for post-conviction relief, *pro se*, complaining that he had not received the effective assistance of counsel from his attorney ("Counsel") because Counsel: (1) failed to introduce pertinent evidence at the suppression hearing; (2) failed to follow up with a witness; (3) failed to introduce inconsistent witness statements; and (4) failed to call a medical expert as a witness. The post-conviction court held a hearing on the petition, during which the following evidence was presented: the Petitioner testified that Counsel was appointed to his case after his initial attorney retired and that he only met with Counsel four or five times before his trial. The Petitioner told Counsel about being investigated by the police, giving them a statement, and then subsequently being part of a police chase during which he stated that the police physically beat him and used mace on him. Counsel told the Petitioner that his version of the police behavior would not help his case. The Petitioner told Counsel that, while being interrogated by the police, he requested an attorney. He recalled Counsel raising that fact at the suppression hearing.

The Petitioner recalled that he discussed with Counsel a witness to his interrogation who could testify to the police's behavior. The Petitioner testified that Counsel failed to try to locate the witness despite the Petitioner giving Counsel the witness's address. The Petitioner also raised with Counsel the fact that the victim's mother's boyfriend, who was in jail at the time of the events related to the trial, had shown the victim and other children in the house his computer that contained sexual

10

images. He stated that Counsel had no reaction to this information. The Petitioner requested a lie detector test, and Counsel never responded to his request. The Petitioner specified that he wanted Counsel to bring up the images on the victim's mother's boyfriend's computer to show the victim's exposure to or knowledge of sexual behaviors. Counsel did not mention the computer at trial.

The Petitioner told Counsel that if Counsel was unable to introduce at trial the forensic medical exam and forensic interview, then the Petitioner wanted another attorney. Counsel "never did anything with that." The Petitioner recalled that the forensic exam revealed that everything was "normal" with the victim after the alleged incidents. The resulting reports from the exam and interviews had discrepancies that the Petitioner wanted Counsel to raise, but he did not. The Petitioner asked Counsel to contact a witness who had seen the police beating the Petitioner after their pursuit of him, but Counsel did not contact her about testifying. The Petitioner asked for an investigator to be assigned to his case, which also did not happen, although Counsel said he would "look into it."

The Petitioner testified that he did not feel prepared to testify at trial and that he and Counsel never developed a trial strategy. He stated that Counsel "encouraged" him to testify but did not prepare him to do so. The Petitioner recalled several inconsistencies in the police officers' statements that Counsel did not explore at trial. Recalling the introduction at trial of his written statement and waiver of rights form, the Petitioner recalled that Counsel discussed their existence with him prior to trial but that he never knew they would be made "part of" the trial. The Petitioner stated, however, that Counsel told him to agree at trial that it was his signature on the documents, despite the Petitioner's assertion that the two signatures did not match.

When prompted by the post-conviction court, the Petitioner summarized his primary claims of ineffective assistance of counsel: Counsel did not have the Petitioner take a lie detector test; Counsel did not raise the issue of the victim's mother's "prior sexual abuse case against her friend['s] . . . son"; Counsel did not arrange for a follow-up interview of the victim; and Counsel did not honor the Petitioner's request to withdraw his representation "if [Counsel] couldn't work [the Petitioner's] case with the forensic interview . . . and forensic medical exam," which contained discrepancies. As to the Petitioner's request to get a second evaluation of the victim, Counsel told him that it would not help his case and neither would pointing out the discrepancies in the forensic exam and interview. When the Petitioner asked him to withdraw, Counsel "got upset" and left their meeting. The Petitioner "believe[d]" that he and Counsel had a consultation before trial but that it was "very, very brief."

The Petitioner testified that Counsel misinformed him of his sentencing exposure

by giving him a range of years, but he conceded that knowing the exact amount of years he could have been sentenced to would not have affected his decision to go to trial. Counsel failed to cross-examine the victim about the inconsistencies between his statements to investigators and his trial testimony. Counsel explained to the Petitioner that the jury would take pity on the victim if Counsel questioned the victim too aggressively. During voir dire, Counsel did not question the prospective jurors about their opinions or views on children's testimony and credibility.

On cross-examination, the Petitioner testified that he also wanted Counsel to raise at the suppression hearing that he had requested an attorney during interrogation and was denied one during the investigation of his case. The Petitioner agreed, however, that Counsel asked him at the suppression hearing if he had any additional information he wanted to provide to the trial court. He also agreed that would have been an opportunity for him to raise the issue of having been denied representation and beaten by the investigating officers. The Petitioner agreed that he was questioned by the trial court about his decision whether or not to testify at trial and the advice he had been given by Counsel, and he told the trial court that he wanted to testify and was doing so of his own free will.

Investigator Jeff Slayton testified that he worked for the sheriff's department and investigated the Petitioner's case and testified at his trial. He agreed that a report he made about the case and his recollection of his investigation differed and that Counsel pointed out a discrepancy between the two at trial.

Counsel testified about the Petitioner's claim that he was denied an attorney during the investigation of his case, specifically during an interview in December 2009. Counsel stated that the Petitioner never raised that as an issue despite being given the opportunity to do so at the suppression hearing and at trial. Counsel recalled that, in a previous August 2009 interview, the Petitioner requested an attorney. It was during the December 2009 interview that the Petitioner gave a statement that was ultimately read aloud to the jury at trial. Counsel agreed that he was told by the Petitioner that he was beaten and physically abused by the police, but he disputed that the Petitioner told him this occurred during the interview. Counsel recalled that the Petitioner told him it happened several hours after the interview. As to the Petitioner's claim that Counsel failed to call a witness to the abuse to testify at trial, Counsel said he was not aware that the witness had actually seen any physical abuse during the interrogation. Had Counsel been aware of these grounds, he "absolutely" would have raised them at the suppression hearing.

Counsel testified that he did not want a video recording of the forensic interview introduced as evidence because it was "particularly damning" for the Petitioner. In the

12

recording, the victim mentioned twelve different occasions involving sexual contact between the victim and the Petitioner, and he also mentioned two other child victims. The victim spoke in the interview with particularity about the sexual contact, including dates, locations, as well as identifying the Petitioner and what the Petitioner was wearing. Counsel said it was a "defense tactic" not to introduce the video and would have hurt the Petitioner's case. As to the Petitioner's allegation that Counsel failed to call a medical expert to testify, Counsel recalled that because the allegation was that the Petitioner had performed oral sex on the victim, a medical expert's testimony would not have helped in any way to refute that allegation. He further stated that because there were no allegations of penetration with regard to the attempted rape of a child, a forensic medical examiner would not have found any evidence of sexual contact. Counsel also recalled that the forensic medical examiner had spoken to the victim and would have testified about the victim's statements to her, further damaging the Petitioner's defense.

On cross-examination, Counsel stated that a jury-out hearing was held on the issue of introducing evidence that the victim's mother's boyfriend had a computer in the victim's home that contained pornographic images. The trial court sustained the State's objection to any testimony about the victim's exposure to pornography. Counsel recalled that he called four character witnesses to testify on the Petitioner's behalf. He did not recall the Petitioner requesting a lie detector test, but he would have advised the Petitioner that its results would not have been admissible in court.

Counsel stated that, in his opinion, there was no need for an investigator in this case because there was no DNA evidence, no fingerprints, or other witnesses to the sexual acts. Counsel felt that he was able to investigate the case on his own by talking to witnesses, but there were not many witnesses to interview. As to the Petitioner's claim that Counsel did not confront the victim with the inconsistencies between his prior statements and his testimony at trial, Counsel stated that he did not want to open the door to prompt the State to introduce the victim's statements given in the forensic interviews. Counsel did not recall the Petitioner requesting an evaluation of the victim's knowledge of sexual behavior. In his experience at the time, there were such experts who could evaluate a child's sexual knowledge based on a forensic interview. Counsel testified that, at best, such testimony would be inconclusive.

Counsel testified that, had the Petitioner asked him to withdraw his representation, he would have brought it to the attention of the trial court. Counsel said unequivocally that the Petitioner did not ask Counsel to withdraw. Counsel testified that he met the Petitioner in jail at least seven times and was present in court with him quite a few times before trial.

Counsel recalled asking Investigator Slayton about the discrepancies in his reports

but did not emphasize them. Counsel prepared the Petitioner to testify by asking him every question he might be asked at trial.

At the conclusion of the hearing, the post-conviction court denied the petition, stating the following:

> The [P]etitioner lies under oath. He tells the court that. And so the [P]etitioner's testimony today is suspect. And [Counsel's] testimony is not. [Counsel] hasn't been impeached in any way.
>
> . . . .
>
> This was a case that had to do with the credibility of witnesses. . . . It boiled down to the testimony of a child against a man who had made a confession. He did not just make an admission, he confessed. The issues of whether that confession was voluntary, whether it was properly mirandized, whether it should come before the court had been decided by the trial level court and the Appeals Court. Both found it was a good admissible statement. . . .
>
> And this court has read the transcript of the suppression motion and finds that [Counsel] did a good job in his motion to suppress. He lost and the facts were against him. And the proof was that the [Petitioner's] statement was voluntary, that it was not coerced, that it was not induced with promises, that it was properly [M]irandized, and it was a damning admission and confession to the very acts that were charged in the indictment.
>
> . . . .
>
> [Counsel] has given good reason why he did what he did. He has answered very easily, competently, and effectively all of the allegations and the issues that are brought before this Court today.

The post-conviction court also pointed out that the Petitioner had failed to produce at the hearing the witness or witnesses he alleged should have been called to testify at trial. It noted that it was the Petitioner's burden to locate any witnesses and present them to the post-conviction court.

In a written order, the post-conviction court went on to state:

14

The Court accepts all testimony other than the Petitioner's presented during this hearing as credible testimony. . . . Many of the allegations listed by the Petitioner and outlined in this Order were not supported by the testimony or other evidence, and the Court finds they are not a basis for post-conviction relief.

. . . .

The Court finds that the Petitioner has not shown by clear and convincing evidence that [Counsel's] performance prior to or during trial was ineffective. [Counsel's] testimony adequately explains sound reasons for his performance prior to and at trial and his advice to the Petitioner throughout representation.

It is from the post-conviction court's judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends on appeal that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel when Counsel: (1) failed to introduce at trial evidence of the Petitioner's prior request for counsel; (2) failed to introduce evidence of physical abuse suffered by the Petitioner at the hands of law enforcement during his interrogation; (3) failed to follow up with a witness to that abuse; (4) failed to introduce the video recording of the victim's forensic interview; and (5) failed to call as a witness the medical expert who conducted the victim's forensic exam. The State responds that the Petitioner failed to present at the post-conviction hearing any witnesses he claims should have been called to testify at trial and, thus, he is precluded from relief on that claim. The State further asserts that Counsel effectively represented the Petitioner and was found to be credible by the post-conviction court. Thus, the Petitioner has failed to meet his burden of proof. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be

resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect

representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner did not present as a witness at the post-conviction hearing the individual or individuals who he claims should have been called to testify at trial. This is required for him to show Counsel's representation prejudiced him, as "this is the only way the [P]etitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the [P]etitioner." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Thus, he is not entitled to relief on his claims that certain individuals should have been called as witnesses.

As to the Petitioner's remaining claims, the evidence does not preponderate against the post-conviction court's findings. Counsel testified that he was unaware that the Petitioner had made a request for an attorney that went unheeded and that his understanding was that the Petitioner had not been physically abused by the police during his interrogation. The Petitioner presented no evidence to the contrary, and the post-conviction court accredited Counsel's testimony. As to Counsel's decision not to introduce at trial the victim's interview or have the victim's examiner testify, Counsel stated that these were strategic decisions designed to shield the jury from further exposure to the victim's statements about his sexual abuse by the Petitioner. Counsel's strategy also prevented the jury from hearing evidence that the Petitioner had sexually abused other children. We conclude that these were sound tactical decisions that served

the Petitioner's interests at trial, and we will not second guess them. Counsel provided the Petitioner with effective representation. Accordingly, we conclude that the Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE